PUBLIC SERVICE COMMISSION,
Appellant,

v.

AMERICAN GRAIN & CATTLE,
INC., Appellee,

and

Reliance Insurance Company, a Minnesota Corporation, Appellee.

Civ. No. 9557.

Supreme Court of North Dakota.

June 26, 1979.

Rehearing Denied July 11, 1979.

Ohnstad, Twichell, Breitling, Arntson & Hagen, West Fargo, for appellant; appearance by John M. Arntson and Leland F. Hagen, West Fargo; argued by Leland F. Hagen.

Degnan, McElroy, Lamb, Camrud, Maddock & Olson, Grand Forks, for appellee, Reliance Insurance Company; argued by James L. Lamb, Grand Forks.

ERICKSTAD, Chief Justice.

Public Service Commission (PSC) and a group of bond claimants appeal from a district court judgment entered August 18, 1978, which reversed a PSC order that required the payment by the appellee, Reliance Insurance Company, of a $250,000 roving grain and hay buyers bond to the bond claimants. We affirm the district court judgment.

American Grain & Cattle, Inc., a Texas agricultural cooperative, began doing business in North Dakota in 1973. The cooperative was formed in Texas a year earlier by a group of Texas businessmen and its purpose was to pool together the grain raised by its members and market it in large volumes. The principal asset of the cooperative was a 26 million bushel grain terminal facility located in the Texas panhandle. In addition to this large grain terminal, the cooperative also acquired a number of other grain elevators and facilities in Texas, Kansas, Minnesota, South Dakota, and North Dakota. By the middle of 1974, the cooperative had between 300 and 400 members including about 60 North Dakota residents.

In the spring of 1973, the North Dakota Securities Commission informed the cooperative that it could not operate in this state unless it made an appropriate registration and obtained permission to conduct business as a foreign cooperative. Instead of registering with the State Securities Commissioner, the cooperative formed a North Dakota cooperative that was exempt from the registration requirements and the North Dakota farmers then became members of that cooperative. The North Dakota cooperative (AGCI–ND) then contracted with the parent cooperative (AGCI–TEX), delegating all managerial responsibilities to it.

On March 28, 1973, an official of AGCI–TEX contacted the PSC regarding a roving grain buyer's bond and license, which is required by Chapter 60–03, N.D.C.C., of a roving grain buyer before it is allowed to operate in this state. After a series of negotiations between the PSC and AGCI–TEX officials, the PSC wrote a letter to the cooperative informing it that if a $250,000 bond was not filed by February 15, 1974, a cease and desist order would be issued against it. The cooperative subsequently filed the bond with the PSC and a license was issued.

Pursuant to their "pooling arrangement", the North Dakota members committed their entire production to the cooperative. The net proceeds from all sales of grain were paid quarterly to all members on a pro-rata basis. In July, 1974, the cooperative defaulted on its payments and the members filed a complaint with the PSC.

Following a hearing, the PSC ordered Reliance Insurance Company to pay the

proceeds of the bond to the claimants. Reliance Insurance Company appealed to the district court, which subsequently dismissed the appeal on the grounds that it was improperly perfected. In *Reliance Ins. Co. v. Public Serv. Com'n*, 250 N.W.2d 918 (N.D. 1977), we reversed the order of dismissal and ordered that the appeal be reinstated. Following a remand to the district court, it ordered that the matter be remanded to the PSC for the taking of additional evidence. The PSC again ordered that the bond be paid to the claimants and Reliance Insurance Company again appealed to the district court. The district court reversed the PSC's order and PSC and the bond claimants appeal to this court.

In substance, there are two issues on this appeal:

1. Did the cooperative function as a roving grain buyer pursuant to Chapter 60–03, N.D.C.C., and is the bonding company therefore liable on the bond that was filed pursuant to the Chapter?

2. If not, is the bonding company nevertheless liable on the bond on the grounds of estoppel or common law bond?

The cooperative argues that it did not function as a roving grain buyer pursuant to Chapter 60–03, N.D.C.C., but contends instead that it acted as a marketing agent for the members. Section 60–03–01, N.D.C.C. defines a roving grain buyer as follows:

"60–03–01. *Roving grain or hay buyer—Definition.*—The term 'roving grain or hay buyer', when used in this chapter, unless the context thereof otherwise requires, shall mean any person, copartnership, association, agent, or corporation, other than licensed warehousemen and track buyers, *who shall buy grain or hay from the owner for resale and delivery within or without the state or for resale in the local markets.* Nothing contained in this chapter shall apply to public warehouses or public warehousemen and track buyers as defined in chapter 60–02." [Emphasis supplied.]

The cooperative also argues that even if it can be considered a roving grain buyer for purposes of Chapter 60–03, N.D.C.C., the bond covers cash transactions only and the transactions in question do not qualify. Section 60–03–04, N.D.C.C., deals with bond filing by a roving grain buyer and provides as follows:

"60–03–04. *Bond filing by roving grain or hay buyer—Complaint procedure—Orders.*—Before any license is issued to any roving grain or hay buyer, the applicant shall file with the commission a bond in such sum as the commission shall prescribe, but not less than fifteen thousand dollars for each license. Such bond shall:

1. Cover the period of the license;

2. Run to the state of North Dakota for the use and benefit of all persons selling grain or hay to the licensee;

3. Be conditioned for the faithful performance of the duties of the licensee as a roving grain or hay buyer, and be for the specific purpose of protecting persons dealing with the licensee or his or their agent or agents within the state of North Dakota from loss or damage by reason of any violation of this chapter;

4. *Not cover transactions wherein it appears to the commission that the sale was made upon any other terms except than for cash* ; and

5. Be governed by all of the provisions of law applicable to the business of a roving grain or hay buyer and the rules and regulations of the commission relating thereto.

"Any person claiming to be injured or damaged by a breach of the conditions of the bond given by a licensee under the provisions of this chapter may file a complaint with the commission within six months from the date of the breach of the conditions of the bond. After a hearing, held upon notice to the respondent and to the bonding company, the commission shall be empowered to order the respondent or the bonding company, or both, to pay to the complainant any loss

or damage suffered by reason of the breach of the conditions of the bond. If more than one person has been damaged, and the bond is insufficient to pay the entire liability, the penalty of the bond as against the surety shall be ordered to be apportioned among the damaged persons." [Emphasis supplied.]

The claimants respond that the transactions were in essence a sale because the claimants lost the right to recover the grain once it was delivered to the cooperative. The claimants also argue that the transactions in question were for cash pursuant to Section 60–03–04(4), N.D.C.C., and that the PSC determination of this issue should have been upheld by the district court.

■ The district court stated in its memorandum opinion that the cooperative did not function as a roving grain buyer pursuant to Chapter 60–03, N.D.C.C.:

"On May 18, 1973, the American Grain & Cattle Company was incorporated as a cooperative. Its purpose, as stated in its articles of incorporation, was to market grain for farmers. Members who joined the cooperative agreed to deliver all grain produced under their control to the association for marketing. If the association could adopt or enter into any marketing plan for the pooling of the grain, the agreement provided for equalizing returns to producers. The agreement further provided that the cooperative, at its option, could authorize the buyer of the product to remit all money to the member, and it also authorized the cooperative to collect the entire amount due from the buyer. In this connection, the association guaranteed payment of all sums which were due to the member under the agreement. Provision was made for the deduction of dockage, storage, and other expenses of the cooperative. Nowhere in any of the objective evidence was there any indication that the cooperative intended to buy grain directly from its members. Had it done so, the risk of profit or loss thereafter would have rested with the cooperative."

We agree with the district court. Section 60–03–01, N.D.C.C., specifically defines a roving grain buyer as one "who shall *buy* grain . . . from the owner." The articles of incorporation, the membership agreement, and the agreement between AGCI–TEX and AGCI–ND all indicate that the cooperative was to function as a marketing agent for its members and not as a grain buyer. For example, paragraphs 3 and 4 of the membership and marketing agreement provide as follows:

"3. Association agrees to handle or market, and sell in its natural or processed state, all grain so produced and delivered, in such form and manner as Association deems best for the advantage of all persons signing agreements similar hereto and to blend the proceeds thereof with proceeds derived from grain delivered by other producers and establish returns therefor, in such manner as Association shall determine, giving consideration to quality, location of farm where produced and market in which grain is sold.

"4. Association shall pay or at its option authorize the buyer to remit all money due Member for grain delivered hereunder less such deductions, including per unit retain contributions to capital as Association shall determine. Member directs buyer to pay any such deductions, directly to Association."

Similarly, the agreement between AGCI–TEX and AGCI–ND provides that the "Association Member hereby designates the Association as its sole and exclusive agent for the purposes of marketing such grain and/or other agricultural products."

■ We also agree with the district court that "the bond of a roving grain and hay buyer does not cover credit transactions." Pursuant to agreement in this case, the proceeds from the sales of grain were paid quarterly to all members on a pro-rata basis; therefore, the transactions were not for cash pursuant to Section 60–03–04(4), N.D.C.C.

The claimants also argue that even if the cooperative is not considered a roving grain buyer pursuant to Chapter 60–03, N.D.C.C.,

it is now estopped from denying that it was not a buyer of grain, or that the transactions were not for cash. In support of their estoppel argument, the claimants refer us to *National Surety Corporation v. Schwandt*, 279 Minn. 444, 157 N.W.2d 506 (1968). In *Schwandt*, a bonding company posted a $2,000 bond with the state commissioner of agriculture on behalf of a wholesale purchaser of agricultural products. The bond was filed under the assumption that it was required by Minnesota law. Subsequent to the filing, various merchants filed claims against the bond and the bonding company paid the amount of the bond to the commissioner of agriculture. Thereafter, because of an earlier Minnesota decision [*Western Meat, Inc. v. Wilson*, 270 Minn. 275, 133 N.W.2d 631 (1965)] which held that wholesale products dealers who do not purchase directly from farmers are not required to file a bond, the bonding company demanded that the money be returned because its principal was not engaged in the business of purchasing directly from farmers. The Minnesota Supreme Court held that the bonding company was liable even if the principal mistakenly believed that a bond was required:

> " 'A bonding company has certain recognized defenses which it can raise against a creditor, but we have not found a case which permits a bonding company to defend against a creditor's suit on the theory that the principal was not under an obligation to secure the bond. *It would be an anomaly in the law if a bonding company could assert, after it had collected a premium, and had issued a bond for the protection of general creditors, that it would not be liable on that bond even though its principal had become defunct, because the principal mistakenly believed he was under compulsion to secure the bond.*' (Italics supplied.)" *National Surety Corporation v. Schwandt, supra* 279 Minn. at 446, 157 N.W.2d at 507, quoting from *Western Meat, Inc. v. Wilson*, 270 Minn. at 283, 133 N.W.2d at 636.

We believe that the claimant's reliance on *Schwandt* in this case is misplaced.

In *Schwandt*, the bonding company filed a bond because its principal was under the mistaken impression that a bond was required. In this case, the cooperative was required to secure a bond because the PSC believed that the cooperative would be functioning as a roving grain buyer within Chapter 60–03, N.D.C.C. Indeed, the PSC informed the cooperative that if it failed to file a bond, a cease and desist order would be filed against it. In order for the claimants to collect on the bond, however, the cooperative must have in fact acted as a roving grain buyer. In *Employer's Liability Assurance Corporation v. Lunt*, 82 Ariz. 320, 313 P.2d 393 (1957), the Arizona Supreme Court dealt with a similar situation. In *Lunt*, a seller of farm produce brought an action against a purchaser and its surety for the purchase price of 1,200 sacks of onions. The lower court found for the seller against the surety and the surety appealed contending "that the transaction out of which the debt arises is not within the scope of the surety's obligation." The supreme court agreed with the surety:

> "Although the Act [Arizona Fruit and Vegetable Standardization Act] requires that those engaging in the foregoing-enumerated businesses first obtain a license from the Supervisor of Inspection, only commission merchants, agents and packers are required to be bonded for the faithful and honest handling of farm products. [Citation omitted.] The Act does not require a bond for that purpose from a grower-shipper or dealer. All parties hereto concede that the Marketing Company was acting within the statutory definition of a dealer in this transaction in that it bought the onions for resale not at retail and that . . . [the statute in question] was violated since the Marketing Company as a dealer did not pay for the produce within thirty days from date of delivery.

> "It is true that where a bond is given under the authority of a statute, the statute constitutes a part of the bond [Citations omitted.]; and this bond was given pursuant to the requirements of the Ari-

zona Fruit and Vegetable Standardization Act. But since the statute does not require a bond of a dealer, no statutory right of action can accrue in favor of a person injured by a dealer's violation of the Act. Where, as here, a bond is given in compliance with a statute to secure performance of the obligations and duties of commission merchants, or agents, the liability imposed by law cannot include violations of the statutory duties of dealers, for the bond must be given the effect which in reason must have been intended by the statute [citation omitted]." *Employer's Liability Assurance Corporation v. Lunt, supra,* 82 Ariz. at 325–26, 313 P.2d at 397.

■ The claimants would be entitled to the proceeds of the bond if the cooperative and the bonding company are prohibited from denying liability because the principles of estoppel exist. In *Farmers Cooperative Ass'n of Churchs Ferry v. Cole,* 239 N.W.2d 808, 813 (N.D.1976), we quoted the elements of estoppel from 56 A.L.R.3d 1041 as follows:

" 'Based as it is upon a consideration of the facts in light of equitable considerations, public policy, fair dealing, and the like, the basic elements of an equitable estoppel, insofar as it relates to the person being estopped, are: (1) conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than those which the party subsequently attempts to assert; (2) the intention, or at least the expectation, that such conduct will be acted upon by, or will influence, the other party or persons; and (3) knowledge, actual or constructive, of the real facts. Insofar as related to the party claiming the estoppel, the elements are: (1) lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) *reliance, in good faith, upon the conduct or statements of the party to be estopped; and (3) action or inaction based thereon, of such a character as to change the position or status of the party claiming the estoppel, to his injury, detri-*

*ment, or prejudice.' "* 239 N.W.2d at 813. [Emphasis supplied.]

*See also* Section 31–11–06, N.D.C.C.; *Will v. Will,* 249 N.W.2d 227 (N.D.1976); *Cranston v. Winters,* 238 N.W.2d 647 (N.D.1976); *Hutton v. Korynta,* 218 N.W.2d 177 (N.D. 1974); *Sittner v. Mistelski,* 140 N.W.2d 360 (N.D.1966); and *Loff v. Gibbert,* 39 N.D. 181, 166 N.W. 810 (1918).

In this case, there is no showing that the claimants relied to their detriment on the existence of a bond. In fact, most of the North Dakota members joined the cooperative before the cooperative secured the bond. In *Hartford Acc. & Indem. Co. v. Phoenix Sand & Rock, Inc.,* 116 Ariz. 366, 569 P.2d 308 (Ct.App.1977), an Arizona Court of Appeals dealt with the question of estoppel in a bond situation. In *Hartford,* the Arizona court held that a surety on a statutory contractor's bond was not estopped from asserting a prior exhaustion of the bond. It was asserted the surety was estopped because it had failed to notify a creditor of the prior exhaustion of the bond. Estoppel, however, was found inapplicable because the creditor failed to show it had altered its position to its prejudice because of its lack of knowledge of the prior exhaustion of the bond.

■ The claimant's remaining contention is that even if the bond could not technically have been required by the Public Service Commission, the bonding company is liable because the bond constituted a "common-law" bond. Claimants are in essence arguing that by filing a bond, the cooperative waived its right to be bound pursuant to the terms of its bond and the statutes in question. *See* Section 22–03–03, N.D.C.C. Section 1–02–28, N.D.C.C., provides generally for waiver, as follows:

"1–02–28. *Benefit of provisions of law may be waived.*—Except when it is declared otherwise, the provisions of this code in respect to the rights and obligations of parties to contracts are subordinate to the intention of the parties, when ascertained in the manner prescribed by the chapter on the interpretation of con-

tracts. The benefit thereof may be waived by any party entitled thereto, unless such waiver would be against public policy."

This waiver argument is similar to the estoppel argument discussed earlier, but waiver, like estoppel, does not fit the facts in this case. The circumstances surrounding the posting of the bond in this case do not support a theory of waiver, which requires a voluntary and intentional relinquishment of a known right. *Gajewski v. Bratcher*, 221 N.W.2d 614, 628 (N.D.1974).

The North Dakota cases cited by the claimants in support of their argument that the cooperative should be liable on a theory of common law bond are inapposite. In *Braithwaite v. Jordon*, 5 N.D. 196, 65 N.W. 701 (1895), the defendant voluntarily posted the bond and the plaintiff relied on it. Both of these features are absent from this case. *Nesvold v. Thompson*, 56 N.D. 385, 217 N.W. 516 (1928), involved the presence of features existent in *Braithwaite*.

Mindful of the admonition that "hard facts may make bad law," we resist the temptation to bend the law to reach what we might believe to be a better result. *See Nunn v. Equitable Life Assur. Society, etc.*, 272 N.W.2d 780, 786 (N.D.1978). Accordingly, we affirm the judgment of the district court with the thought that this case might serve as an impetus to the Legislature to study this matter with a view to expanding the coverage of bonds in this area of the law.

SAND, PAULSON, and PEDERSON, JJ., and ILVEDSON, District Judge, concur.

ROY A. ILVEDSON, District Judge, sitting in place of GERALD W. VANDE WALLE, J., disqualified.